**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **ROBERT B.,**[1] | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Case No. 21-cv-1352-DWD** |
| | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

**DUGAN, District Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 1383(c). For the reasons discussed below, the final agency decision is due to be affirmed.

## Procedural History

Plaintiff applied for SSI on November 6, 2018, alleging a disability onset date of November 1, 2001. Plaintiff, with assistance of counsel, amended his alleged onset date to November 6, 2018 (Tr. 39). After holding an evidentiary hearing, an Administrative Law Judge ("ALJ") denied his application on April 16, 2021 (Tr. 28). The Appeals Council denied Plaintiff's request for review on September 1, 2021 (Tr. 1), making the ALJ's decision the final agency decision subject to judicial review. *See* 20 C.F.R. § 404.981.

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

Plaintiff exhausted administrative remedies and filed a timely complaint for judicial review.

### Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.  An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in

---

[2] The statutes and regulations pertaining to SSI are found at 42 U.S.C. § 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. These statutes and regulations are identical to those pertaining to Disability Insurance Benefits (DIB), which are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. *See Craft v. Astrue*, 539 F.3d 668, 647, n.6 (7th Cir. 2008).  For convenience, most citations herein are to the DIB regulations.

significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

Here, the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Accordingly, the Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 203 L. Ed. 2d 504 (Apr. 1, 2019) (internal citations omitted).  In reviewing for "substantial evidence," the Court takes the entire administrative record into consideration but does *not* "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; the Court does not act as a rubber stamp for the Commissioner.  *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. At step one, he determined that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date (Tr. 15).  At step two, the ALJ found that Plaintiff has the following severe impairments: major depressive disorder, anxiety, and agoraphobia (Tr. 15).  The ALJ also found that Plaintiff has the non-severe impairments of hypertension

3

and intermittent rashes (Tr. 15).  At step three, the ALJ found that Plaintiff does not have any impairments or combination of impairments that meet any of the listings set forth in the Listing of Impairments (Tr. 16).  The ALJ specifically considered listings 12.04 and 12.06 (Tr. 16).  As for Plaintiff's mental impairments, the ALJ concluded that Plaintiff has moderate limitations in all four functional areas of mental disorders in the Listings of Impairments, 20 C.F.R., Part 404, Subpart P, Appendix 1, and thus did not satisfy the "paragraph B" criteria (Tr. 16-17).  The ALJ also found that Plaintiff's mental impairments did not satisfy the "paragraph C" criteria (Tr. 17).

Before proceeding to step four, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following nonexertional limitations:

> [Claimant] can learn and engage in rote tasks that require the exercise of little independent judgment or decision making and can be learned from a short demonstration; must work in a stable setting where there is little change in terms of tools use, the processes employed, or the setting itself, and change, where necessary, is introduced gradually. Of course, all competitive employment has production requirements, however this individual should not perform fast paced assembly line type of work; but needs production requirements that allow the individual to sustain a flexible and goal oriented pace; would not be able to work a job that required them to engage in work related interactions with the general public; could not perform jobs that involve working in close coordination with co-workers. Therefore, would require jobs that entail no more than occasional and superficial interaction with co-workers; and can perform jobs that necessitate no more than occasional interaction with supervisors.

(Tr. 18).

At step four, the ALJ relied on the testimony of a vocational expert ("VE") to find that Plaintiff had no past relevant work but could make a successful adjustment to other

work that exists in significant numbers in the national economy based on Plaintiff's age, education, work experience, and residual functional capacity (Tr. 27-28). Accordingly, at step five, the ALJ found that Plaintiff was not disabled. (Tr. 28).

## The Evidentiary Record

Plaintiff's application alleges disability based on the following conditions: depression, anxiety, insomnia, suicidal, agoraphobia, high blood pressure, and skin disease (Tr. 163, 292, 311). Plaintiff originally alleged a disability onset date of November 1, 2001 (Tr. 275). However, he amended the alleged disability onset date to November 6, 2018 (Tr. 39), thus the Court's review of the record primarily concerns those documents relevant to this amended date. Related to his current application, Plaintiff completed function reports on January 23, 2019 (Tr. 311-318) and June 17, 2019 (Tr. 357-364), and he at an evidentiary hearing held on April 1, 2021 (Tr. 35-51). Plaintiff also testified at a prior evidentiary hearing held on May 18, 2018 (Tr. 52-93) related to a prior application for benefits (Tr. 98), which was denied on August 28, 2018 (Tr. 108). Plaintiff's brief references statements made by Plaintiff during this prior hearing (Doc. 16, p. 9), and thus the Court's summary of the record accounts for this prior testimony as well.

Plaintiff was 55 years old at the time of his alleged disability onset date (Tr. 27). Plaintiff lives alone (Tr. 40, 311). He holds a bachelor's degree in sociology (Tr. 40, 58, 293). Plaintiff testified that he has dealt with severe depression, agoraphobia, and high anxiety most of his life (Tr. 41). However, in 2015, his depression became worse, and he started feeling suicidal, so he sought treatment from Centerstone Mental Health Center (Tr. 41). After starting treatment, he says he has "gotten above the suicidal level" but still

struggles with depression and controlling his anxiety and agoraphobia (Tr. 41). He feels he is becoming less resilient with managing his conditions than when he was younger (Tr. 42).

Plaintiff reported that his conditions limit his ability to walk, remember, complete tasks, concentrate, understand, follow instructions, maintain a schedule, use his hands, and on some mornings, he cannot get out of bed (Tr. 311, 316, 362). Plaintiff has no issues with getting along with people (Tr. 362). Plaintiff testified that he has good days and bad days (Tr. 46, 353). On his bad days he cannot get out of bed (Tr. 353, 357). Plaintiff estimated that he has four to five bad days each week where he has difficulty focusing, concentrating, and doing his daily activities (Tr. 46-47).

Plaintiff has not worked consistently since November 1, 2001, when he worked as a cashier (Tr. 40, 292-293). However, from approximately January 2002 to 2016, he intermittently engaged in reselling items, or "junking", for income (Tr. 41, 293, 346). At the evidentiary hearing in April 2021, he testified that he has not worked in the last couple of years (Tr. 40) following the worsening of his symptoms in 2015, although at some point he did sell some of his possessions (Tr. 41).

Plaintiff attends counseling sessions (Tr. 265). He also takes several medications for his conditions, including escitalopram for depression, losartan with hydrochlorothiazide and nifedipine for blood pressure, doxepin for insomnia, diazepam for anxiety, and propranolol for anxiety and high heartrate (Tr. 42-43). At the hearing in April 2021, Plaintiff testified that he did not have severe side effects from the medications, but believed the medications caused a decreased in his coordination (Tr. 47). Elsewhere

6

in the record, Plaintiff also reported the side effects of increased urination (Tr. 318) and negative impacts on his memory (Tr. 72).

Plaintiff's longtime friend and neighbor, Michael Johnson, completed adult function reports on January 29, 2019 (Tr. 323-332), June 18, 2019 (Tr. 369-377), and January 22, 2021 (Tr. 412-414). Mr. Johnson reported that Plaintiff's conditions affect his ability to lift, walk, hear, remember, complete tasks, concentrate, understand, follow instructions, and use his hands (Tr. 329, 374). Mr. Johnson reported that Plaintiff gets along with others and speaks to him on the phone daily but has become more reclusive and is sometimes anxious around authority figures (Tr. 373-375). Plaintiff occasionally cares for Mr. Johnson's cat (Tr. 370). Mr. Johnson also reported that Plaintiff struggles with his personal care, stating that Plaintiff wears the same clothes a lot, bathes maybe once a week, appears unkempt at times, and is apathetic or unable to conduct normal housekeeping and cleaning (Tr. 370). In January 2021, Mr. Johnson reported that he will go to the store for Plaintiff and assist him when able (Tr. 414). He also stated that Plaintiff's conditions were exacerbated by the Covid-19 Pandemic (Tr. 414).

### *Relevant Medical Records*

Plaintiff began treating with practitioners at Centerstone of Illinois in or about 2015 (Tr. 41, 481-833, 1279). Plaintiff's treatment notes indicate that he continues to be treated for Major Depression, Agoraphobia, and fear of medical care (Tr. 514, 701). These conditions have been ongoing "for many years" (Tr. 514, 707). Plaintiff's treatment consists of individual counseling sessions, case management sessions, and psychiatry examinations (Tr. 514).

From August 2018 to March 2021, Plaintiff's treatment notes and exams were mostly normal (Tr. 482-1338).  During this period, Plaintiff attended counseling sessions twice a month, attended case management sessions once a month (Tr. 1304), and was treated by a psychiatrist regularly (Tr. 1304).  Plaintiff was treated by Paul Carter, MD, LPHA (Tr. 493-498, 1006, 1140-1166), Anita Lloyd, MS, LCPC, LPHA (Tr. 597, 620, 1180-1187, 1191-1198, 1201-1205, 1262-1268), Mary Gray, MS, RN, QMHP (Tr. 592, 609), Allison Lence, RN, QMHP (Tr. 1188-1190, 1199-1200, 1252-1253),  Rachel Dawkins, QMHP (Tr. 594, 608, 1206-1213, 1219-1224, 1269-1274),  Tammy Hanson, AAS, LPN, MHP (Tr. 1214-1218, 1231-1235, 1240-1244, 1249-1251, 1254-1261),  Ashlie Hoopes, AAS, RN, QMHP (Tr. 946-948, 975-976),  Brittany Bulfer, MSQ, QMHP (Tr. 957-959, 964-966),  Janice Fisher, MHP (Tr. 971-972), Monettee Logue, MHP (Tr. 1007-1010),  and Bridgett Holder, MSW, QMHP (Tr. 1225-1230, 1236-1239, 1245-1248). Most of Plaintiff's later sessions were conducted by phone, but previously he had been attending sessions in person.

Plaintiff often reported that he felt "stable" (Tr. 1245), was "hanging in there" (Tr. 1193, 1245), or "doing pretty good" (Tr. 1142, 1148, 1154).  He reported feeling depressed and anxious most days (Tr. 1220, 1238, 1267).  Plaintiff also indicated that his medications were working (Tr. 618, 830, 947, 955, 1117), and he was benefiting from them (Tr. 492, 978, 1134), without side effects (Tr. 499).  Plaintiff's providers often reported that he was stable or improved (Tr. 502), doing well (Tr. 1152, 1225), using coping mechanisms (Tr. 958 1149, 1155, 1224, 1245), and making progress towards his goals (Tr. 599, 601, 984, 1107, 1145, 1211, 1236, 1247).

Plaintiff consistently identified triggers which exacerbated his conditions.  He

often expressed increased struggles caused by external circumstances (Tr. 494, 499, 1126, 1168, 1224), such as: when negative events occurred for his friends and sister (Tr. 842, 951, 1168, 1180, 1221-1222, 1224); during winter (Tr. 1224); throughout the Covid-19 pandemic, and particularly when he was sick (Tr. 1229) or he felt his exposure to catching the virus was increased (Tr. 1143, 1149, 1154, 1168, 1182, 1194, 1196, 1197, 1202, 1205, 1210, 1212, 1228); when he anticipated a change in his life (Tr. 614), such as changing medications (Tr. 1172, 1236, 1238-1239, 1245), or having his home remodeled (Tr. 493, 592, 594, 597, 608, 992, 1287), which required him to stay with friends or his neighbors (Tr. 499, 597, 607, 611, 954); when he cared for his neighbor's cat (Tr. 961); when helping his sister (Tr. 968, 981, 1090); or when he had car issues (Tr. 1112).

Plaintiff also expressed positive use from various coping skills, which ranged from reading (Tr. 1185, 1220, 1224, 1307), listening to music (Tr. 982, 1108, 1185, 1220, 1307), playing guitar (Tr. 965, 1108, 1224), mediation (Tr. 1108), journalling (Tr. 1226, 1228, 1236, 1245), speaking with friends and family (Tr. 1220, 1228, 1247), walking (Tr. 1155, 1187, 1211), using light therapy (Tr. 1155, 1226, 1238, 1247), doing visualizing exercises (Tr. 500, 611, 951), and watching videos or using the internet (Tr. 1308, 1333).

Practitioners at Centerstone completed reassessments of Plaintiff's conditions in November 2018 (Tr. 538-543, 637-643), February 2019 (Tr. 507-531, 852-856), June 2019 (Tr. 857-860, 880-889), April 2020 (Tr. 1262-1268, 1275-1280, 1286-1295, 1304-1323), and October 2020 (Tr. 1281, 1296-1303, 1325-1336). The practitioners noted few changes between the assessments. In November 2018, Plaintiff reported not being able to get out of bed at times, having to work hard to motivate himself to do daily tasks, and rarely

going out to do anything recreationally (Tr. 553). Plaintiff stated his depression causes crying outbursts, irritability, social withdrawal, lack of interest, changes in eating and sleeping patterns, feelings of guilt, worthlessness, hopelessness, suicidal ideations, and one past suicide attempt (Tr. 553). His anxiety "is off and on lasting throughout the day" and can be triggered by different things, resulting in feelings of nervousness, restlessness, difficulty concentrating and controlling his worry, irritability, increased heart rate, shortness of breath, sweating, shaking, muscle tension, and upset stomach (Tr. 553-554). Plaintiff's mental status examination revealed good or normal findings (Tr. 542-543). Around this time, Plaintiff also reported being able to leave his house to vote, attend doctor's appointments and get a flu shot (Tr. 594). In December 2018, Plaintiff was also able to undergo a tooth extraction despite his medical phobia (Tr. 493).

In February and June 2019, Plaintiff again reported that his conditions cause him to stay in bed some days and keep him from going places, like the doctor (Tr. 510, 860). Plaintiff stated that his depression symptoms "come and go" and that when he is depressed, he loses interest in almost all activities, most of the day, nearly every day (Tr. 523). Plaintiff reported few issues and indicated that he has a stable place to live, friends who provide him support, and that he can take care of his daily living activities and routines, make good decisions, communicate well, and enjoy reading (Tr. 510, 518). Plaintiff's mental status examination revealed good or normal findings in all categories except for Plaintiff's mood, which was depressed, and anxious (Tr. 515, 869). Counselor Lloyd also observed that Plaintiff was involved with his care and attends appointments regularly (Tr. 518), but struggles with withdrawing, decision making, and completing

tasks (Tr. 523).  Lloyd concluded that Plaintiff's symptoms cause clinically significant distress (Tr. 523).  In February 2019, Paul Carter, MD, LPHA, also opined that Plaintiff should qualify for disability benefits "given burden of symptoms and significant chronic impact they have had on daily functioning and level of distress" (Tr. 500).

In April and October 2020, Plaintiff reported feeling depressed most days, every day, and having a lack of motivation almost every day (Tr. 1267, 1274).  He stated his conditions cause him to constantly worry about things, have muscle tension, and sometimes he develops hives, has sleep disturbance without medications, is irritable, fatigued, lacks motivation, and has trouble recalling events (Tr. 1262-1267, 1316).  He also reported having increased fear and anxiety when using public transportation, being outside his home alone, and dealing with doctors (Tr. 1293), in addition to worsening depression symptoms because of the Covid-19 pandemic (Tr. 1274).

Counselor Lloyd observed that Plaintiff continued to take care of his daily living activities and routines, is good at decision making, communicates very well, functions well intellectually, has no problems with communications, and gets along well with his sister who provides him with financial support (Tr. 1268).  She also indicated that Plaintiff has no risk behaviors to others, and no current threats to his safety (Tr. 1277-1278). She further identified Plaintiff's strengths as coming to his appointments regularly, actively working on ways to manage his symptoms, being an avid reader, having goals of managing his symptoms and gaining an income, having good family supports and close relationships with neighbors, being good at selfcare, holding a bachelor's degree and having an interest in sociology, philosophy, and history (Tr. 1293-1294).

Plaintiff's October 2020 mental examination findings showed normal or good results, except in the categories of mood and affect, which Rachel Dawkins indicated were depressed, anxious, and constricted (Tr. 1285).

From 2018 to 2020, Plaintiff was also treated at the emergency room twice for hives and a toothache (Tr. 426-436, 1323).  On November 15, 2018, emergency room doctor, John Girardi, M.D. indicated that Plaintiff's psychiatric condition was normal, not anxious, or depressed, and that he was a "very pleasant gentleman" (Tr. 431).

During this time, Plaintiff was also treated by his primary care physician, Richard K. Buchman, M.D. (Tr. 447-461, 1341-1347).  Plaintiff was treated by Dr. Buchman almost monthly from February 2018 to January 2019 (Tr. 447-461, 840-845), and routinely thereafter (Tr. 1021-1029, 1345-1346).   Except for his February 2018 appointment, Plaintiff reported feeling anxious at his medical appointments, and Dr. Buchman observed this anxiousness on Plaintiff's physical examinations (Tr. 449, 451, 452, 457-46, 841-842, 1026).  Plaintiff indicated that he is always nervous in medical offices (Tr. 458).  He also reported seeing psychiatry and doing exercise to try and control his symptoms (Tr. 449, 458).

Dr. Buchman's treatment notes contained multiple observations concerning Plaintiff's anxiousness.  On June 21, 2018, Dr. Buchman reported that Plaintiff was "[v]ery pleasant and respectful as always but pacing around room wringing hands due to nervousness; usually does better than this in public circumstances when he's taken his propranolol" (Tr. 453).  On July 26, 2018, Dr. Buchman observed that Plaintiff was less nervous than on prior exams (Tr. 455), and Plaintiff reported that his anxiety is "tolerably controlled" on his current regimen (Tr. 454).  On October 29, 2018, Plaintiff reported

having a stressful month, but that his anxiety is generally under control (Tr. 458). Dr. Buchmam observed that he was nervous/anxious, but no more so than is typical for him, and that he is always nervous in medical offices (Tr. 458). On November 29, 2018, Dr. Buchman indicated that Plaintiff was anxious, his speech was rapid/pressured, and he was hyperactive, but his mood and attention were normal (Tr. 459).

Apart from anxiousness and nervousness, Plaintiff's exam findings were normal (Tr. 449, 451, 452, 457-46). Occasionally, Plaintiff reported on situational stressors that increased his nervousness and anxiety. For example, in February 2018, Plaintiff reported having some setbacks with stress because his sister broke her ankle, and he was taking care of her household chores (Tr. 447). However, he denied being nervous or anxious, dysphoric mood, self-injury, and suicidal ideas, and reported that he was sleeping better with trazodone (Tr. 447). In October 2018, Plaintiff reported having a stressful month because of working being done on his home (Tr. 458). In February 2020, Plaintiff reported being shaken after a truck pulled out in front of him on the way to his appointment (Tr. 1341). Dr. Buchman's examination revealed mostly normal findings, but with nervous and anxious behaviors (Tr. 1342). However, Dr. Buchman noted that Plaintiff's shakiness and anxiousness was "significantly less" than when he first started treating Plaintiff (Tr. 1342). In July 2020, Plaintiff reported that his anxiety and agoraphobia were worse since the Covid-19 pandemic (tr. 1345). Dr. Buchman noted that Plaintiff was anxious and nervous for his exam, but his exam was otherwise normal (Tr. 1345-1346).

In 2019, state agency examiners, M.W. DiFonso, Pys.D, Lionel Hudspeth, Psy.D, and Michael Cremerius, Ph.D assessed Plaintiff's conditions (Tr. 118-119, 133-152). Dr.

13

DiFonso and Dr. Hudspeth both concluded that Plaintiff could complete "multiple step productive" activities with reduced interactions around supervisors and the public (Tr. 122-123, 137, 152-153).   Dr. Cremerius further limited Plaintiff to understanding, remembering, and performing simple and detailed instructions, with complex instruction and tasks precluded (Tr. 148).   Dr. Cremerius also concluded that Plaintiff could tolerate brief and superficial contact with co-workers and supervisors, but no-contact with the public (Tr. 148).   Finally, Dr. Cremerius opined that Plaintiff could not complete fast-paced tasks with strict production quotas, but variable paced tasks with end of day production quotas were acceptable (Tr. 148).

## Analysis

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because he failed to properly evaluate Plaintiff's subjective symptoms (Doc. 18).   Plaintiff testified that his symptoms were severe four days a week to the point they prevented him from maintaining focus and motivation at work (Tr. 46).   According to testimony from the vocational expert, absence of two or more days of work a month would preclude competitive work (Tr. 50).

The regulations set forth a two-step process for evaluating a plaintiff's statements about his impairments. *See* 20 C.F.R. § 416.929. An ALJ first determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 416.929(a).   However, "statements about [a claimant's] pain or other symptoms will not alone establish that [they] are disabled." *Id.* If a claimant's pain could reasonably be expected to produce the pain or symptoms

14

alleged, the ALJ will then "evaluate the intensity and persistence" of the plaintiff's symptoms and determine how they limit the plaintiff's "capacity for work." 20 C.F.R. § 416.929(c).

In applying the second step, the ALJ considers all the available evidence from medical sources and nonmedical sources about how plaintiff's symptoms affect them. 20 C.F.R. § 416.929(c)(1); Soc. Sec. Ruling 16-3p (S.S.A. Oct. 25, 2017). The ALJ will not reject a claimant's statements about their symptoms, or the effect symptoms have on a claimant's ability to work "solely because the available objective medical evidence does not substantiate" plaintiff's statements. 20 C.F.R. § 416.929(c)(2). Further, in considering non-objective medical evidence, the ALJ considers a list of non-exhaustive factors, which include: (i) daily activities, (ii) location, duration, frequency, and intensity of pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (v) treatment, other than medication, received for relief of pain or other symptoms, (vi) any measures used by the claimant to relieve pain or other symptoms, and (vii) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3); Soc. Sec. Ruling 16-3p (S.S.A. Oct. 25, 2017)., at *7-*8.

"An ALJ is only required to explain the weight given to a claimant's statements in a manner sufficient to provide a fair sense of how the ALJ assessed the claimant's testimony." *Charles G. v. Kijakazi*, No. 21-CV-393, 2022 WL 2715676 (N.D. Ill. July 13, 2022), at *5 (citing Social Security Ruling ("SSR") l6-3p). "An ALJ's assessment of a plaintiff's subjective statements of symptoms need not be flawless and is entitled to deference

unless it is 'patently wrong,' which is a 'high burden.'" *Charles G.*, 2022 WL 2715676, at *5

(citing *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015); *Turner v. Astrue*, 390 F. App'x

581, 587 (7th Cir. 2010)). "[O]nly when an ALJ's assessment lacks any explanation or

support will a court declare it to be 'patently wrong.'" *Elder v. Astrue*, 529 F.3d 408, 413

(7th Cir. 2008)); *Charles G.*, 2022 WL 2715676, at *5.

      The ALJ found that Plaintiff's impairments could reasonably be expected to cause

the alleged symptoms.  However, he did not find Plaintiff's statements concerning the

intensity, persistence, and limiting effects of these symptoms to be consistent with

Plaintiff's "treatment history, objective evidence, and the claimant's functioning and

activities" (Tr. 19, 24).  The ALJ explained that Plaintiff had a long history of complaints

of anxiety, depression, and agoraphobia, starting at least around 2015, but that his

medications have been "fairly stable", and the record did not reveal any significant side

effects from the medications (Tr. 24).  The ALJ referenced "numerous reports" finding

Plaintiff had significant benefits from medications, therapy, and primarily situational

complaints related to the remodeling of his home, illness of his friend and sister, and

additional stress related to the pandemic (Tr. 24).  While the ALJ referenced Plaintiff's

anxiousness in attending medical visits, he also noted that Plaintiff had regular

attendance at these medical appointments and his mental status findings were almost all

unremarkable (Tr. 24-25).

      The ALJ also highlighted Plaintiff's ability to shop, drive, and live alone without

significant limitations (Tr. 24), in addition to his ability to employ copying skills to

complete his activities of daily living without any significant difficulty (Tr. 24).  He also

referenced Plaintiff's statements from his Function Report, indicating that Plaintiff had no problems getting along with others, was able to travel alone, had regular contact with his neighbor, sister, and caseworker, and was able to care for his neighbor's pet when his friend was away (Tr. 16).  The ALJ also referred to Plaintiff's successes in being able to tamper off one of his medications without any significant decline in functional abilities, navigate the pandemic without significant decline, spend time with and provide care for his sister and friends, and even temporarily live with a friend during the time his home was remodeled (Tr. 24-25).  Finally, the ALJ referenced Plaintiff's description of his activities and function reports showing higher-level cognitive, social, and psychological activities (Tr. 25).

Plaintiff finds fault with this analysis, arguing that the ALJ only focused on Plaintiff's "good days" without considering his conditions on "bad days" (Doc. 16). Plaintiff also complains that the ALJ unfavorably commented on Plaintiff's past employment, suggesting that Plaintiff was unemployed for improper reasons (*See* Tr. 24) (Plaintiff's earning records suggest "his limited work history may not be fully related to his impairments").  The Seventh Circuit consistently instructs that statements made by a claimant, particularly one with mental health conditions, should be evaluated with the whole record because mental illness symptoms can frequently fluctuate.  *See Smith v. Colvin*, No. 13 C 9108, 2017 WL 635143, at *4 (N.D. Ill. Feb. 16, 2017); *Bauer v. Astrue*, 532 F.3d 606 (7th Cir. 2008) (treatment records showing improved conditions on occasion may not present a full picture of a claimant's ability to work when claimant suffers from chronic disease, is under continuous treatment, and may have better days and worse

days); *Punzio v. Astrue*, 630 F.3d 704, 710–711 (7th Cir. 2011) ("[A] person who suffers from a mental illness will have better days and worse days, so a snapshot at any single moment says little about her overall condition.").

Here, Plaintiff argues that the statements in the record showing Plaintiff's "improvement" and "stability" must be compared to where Plaintiff's treatment started in 2015, i.e., when he testified that "things were terrible", and he was suicidal and unable to get out of bed every day (Doc. 16) (quoting Plaintiff's testimony from the May 2018 evidentiary hearing, at Tr. 65).   Thus, Plaintiff maintains that when he stated that his symptoms were better than this low point, those statements should be understood as Plaintiff communicating that he was no longer suicidal, but not that he was without symptoms or experiencing ups and downs (Doc. 16, p. 9).

Defendant, however, maintains that the ALJ properly considered Plaintiff's fluctuating symptom reports, made at several visits, and specifically considered these statements in connection with the largely normal evaluations at the same appointments. The Court agrees.   This is not a case where the ALJ referenced single instances of normalcy and ignoring Plaintiff's difficult dates.   *Cf. Antonio P. v. Saul*, 2020 WL 1910345, at *7 (N.D. Ind. Apr. 20, 2020) ("The ALJ failed to explain why, despite the other record evidence that Plaintiff had difficult days, single instances of normalcy discounted the opinions of [providers] that Plaintiff had a limited ability to carry out day-to-day work tasks.").   Instead, the ALJ considered over two-dozen individual mental health appointments Plaintiff attended from 2018 to 2021, most of which indicated unremarkable clinical observations and mental status findings (Tr. 19-24).  The ALJ also

crafted Plaintiff's RFC with more specific limitations to account for Plaintiff's subjective complaints, including his need for more flexible and goal-oriented work requirements opposed to stringent production or quota-based requirements (Tr. 26).

After considering the full record, and looking at the ALJ's reasoning, this Court cannot find that the ALJ was "patently wrong." Instead, the ALJ went through all the evidence and determined that Plaintiff's subjective allegations were not consistent with the facts in the record. Nor did Plaintiff's providers recommend any specific limitations due to his conditions. *See Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018) ("There is no error when there is 'no doctor's opinion contained in the record [that] indicated greater limitations than those found by the ALJ.'") (quoting *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)).  While Dr. Davis concluded that Plaintiff "should qualify for disability benefits" (Tr. 494, 500), the ALJ properly discounted this conclusory statement, reasoning that Dr. Carter did not explain or provide any specific functional limitations, and his conclusion conflicted with treatment records indicating that Plaintiff's symptoms were managed well with therapy and medications, and with no functional deficits (Tr. 26).

Unlike medical opinions, which are "statement[s] from a medical source about what [the claimant] can still do despite [their] impairment(s)", 20 C.F.R. § 416.913(a)(2), Dr. Davis's conclusion contained no functional limitations.  Thus, the ALJ was not required to analyze how he considered this evidence.  *See* 20 C.F.R. § 419.920b(c)(3)(i) ("statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work" are issues reserved to the Commissioner and are thus "inherently neither valuable nor persuasive to the issue of whether you are disabled" and

the ALJ "will not provide any analysis about how [they] considered such evidence in [their] determination or decision").

Finally, Plaintiff argues that the ALJ unfairly "insinuated that [Plaintiff's] inability to work had less to do with symptoms of mental illness and more a personal choice." (Doc. 16, p. 3). Plaintiff appears to take issue with the following statement: "The claimant indicated that the symptoms started around 2015 but the earnings records show very little earnings with only $4479 of earnings in 2001 suggesting his limited work history may not be fully related to his impairments" (Tr. 24).  Plaintiff maintains that the ALJ ignored Plaintiff's testimony about his work as a "junker" and argues that this shows the ALJ failed to fairly evaluate the record (Doc. 16, pp. 13-14).  The Court disagrees.  Indeed, the ALJ did refer to Plaintiff's work as a "junker" (*See* Tr. 18) ("[I]n the past, he collected junk to sell to earn income"). Further, the ALJ was permitted to consider this evidence in evaluating Plaintiff's subjective symptoms.  *See* 20 C.F.R. § 416.929(c) (the ALJ considers "any other information" about claimant's symptoms, including medical and nonmedical sources).  Finally, even if the ALJ's construction can be inferred as a negative inference against Plaintiff, an ALJ's subjective symptoms assessment need not be perfect. *See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (finding some of the ALJ's credibility findings "a bit harsh", yet not "patently wrong" because there was "some support in the record" for the findings).

In all, the ALJ gave multiple valid reasons for finding that the evidence did not completely support Plaintiff's allegations of disabling symptoms.  In the end, Plaintiff's arguments are little more than an invitation for this Court to reweigh the evidence.  He

has not identified any error requiring remand.  Even if reasonable minds could differ as to whether Plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence.  *Burmester*, 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## <u>Conclusion</u>

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**. The Clerk of Court is directed to enter judgment in favor of Defendant.

**SO ORDERED.**

Dated: March 28, 2023

_____
DAVID W. DUGAN
United States District Judge